JAMES M. ALLGOR et al.

*v.*

THE NEW JERSEY STATE HOSPITAL AT TRENTON et al.

[Decided September 14th, 1912.]

1. Act of July 5th, 1906 (*P. L. 1906 p. 715; 3 Comp. Stat. 1910 p. 3206 § 125 et seq.*), section 1, providing that no person shall be confined as insane, except upon an application with the attached certificate of two physicians, under oath, setting forth the insanity of the person, and, in section 2, that no person shall be held in confinement as insane for more than fifteen days, unless the applicant shall cause the matter to be presented to a justice of the supreme court, is intended as a protection of the public insane asylums, and to prevent their being burdened with the care of sane persons, and is not intended to provide for the apprehension and confinement of persons alleged to be insane; and the confinement, on two successive applications, made under this statute, and not by virtue of an order before some legal tribunal, of a person not dangerously insane, was unauthorized.

2. To construe such statute so as to authorize such confinement merely on the applications, without some form of legal proceeding, would render it violative of Const. U. S., Amend. 14, providing that no state shall pass any law which shall deprive any person of liberty without due process of law.

3. Where, in *habeas corpus* proceedings, the judge determined that the party alleged to be insane should be released, so far as anything set up by the return showed, the judge was not required, by the *Habeas Corpus* act (*2 Comp. Stat. 1910 p. 2646*), section 31a, relating to inquiry into the sanity of persons confined in hospitals for the insane, to proceed with a useless inquiry into his sanity.

4. *Habeas Corpus* act (*2 Comp. Stat. 1910 p. 2646*), section 31a, relating to inquiry into the insanity of persons confined in hospitals for the insane, applies only to cases where there has been a commitment founded, or purporting to be founded, upon a finding of insanity.

---

This is a hearing upon a writ of *habeas corpus* sued out on behalf of James M. Allgor, who is confined at the New Jersey State Hospital at Trenton (the state asylum for the insane).

In the return to the writ made on the 5th day of August, 1912, the respondents set up that James M. Allgor

"is restrained of his liberty and detained at the N. J. State Hospital at Trenton, but ❊ ❊ ❊ is duly restrained lawfully by virtue of two requests and certificates for indigent patient's commitment to the New Jersey State Hospital (for the insane) at Trenton, ❊ ❊ ❊."

It then sets out that the first of said requests was made by Jacob Abrams and the second by Peter Hall Packer; that Allgor was "admitted for confinement as an insane patient" on the 24th day of July, 1912.

The return concluded by stating that the said Allgor is restrained of his liberty by virtue of the provisions of an act "entitled," &c., "approved July 5, 1906, chap. 324, P. L. 1906, p. 715," &c.

Attached to the return are the two requests and certificates mentioned therein. They are identical in form and entitled "Request and Certificates for Indigent Patient's Commitment to the New Jersey State Hospital (for the Insane) at Trenton."

The first is dated July 22d, 1912, and is the request of Jacob Abrams. The request concludes: "The undersigned is a Chief Marshall, Borough of Sea Bright of the said James Monroe Algor." There are certificates by John W. Bennett, M.D., and by Charles J. Greiner, M.D., sworn to by each "on information and belief" on the 22d of July, 1912, before P. Hall Packer, a notary public. There does not appear to be any reference in either certificate or affidavit as to the time or times when any examination of the patient was made. It was under this first request that Allgor was received at the asylum on July 24th, 1912. The second request is dated August 2d, 1912, and is made by Peter Hall Packer. Among other things it recites:

"The circumstances causing the applicant to interest himself is All-gor's conduct in the community * * * The undersigned is a Justice of the Peace Monmouth County of the said James M. Allgor's District."

Attached to the request are certificates of John W. Bennett, M.D., and Harry E. Shaw, M.D., with similar affidavits and lack of statement of time or times of examination of patient.

The petitioners traversed the return and set up first that said Allgor was not lawfully restrained of his liberty by virtue of two said requests, &c. Second, that Abrams had signed the request by mistake and misapprehension as to its contents and effect, and subsequently personally visited the hospital and informed the medical director of such fact and that he, Abrams, withdrew from and would no longer be sponsor for any such request. Thirdly, the qualifications of the physicians certifying are attacked.

As to the Packer request the traverse denies its efficacy as a commitment and attacks the physicians' certificates, &c.

*Mr. William J. Leonard,* for the petitioners.

*Mr. Edmund Wilson,* attorney-general (*Mr. Francis H. Mc-Gee,* with him), for the respondents.

GARRISON, V. C. (after making above statement).

So soon as the return was made and the traverse presented it was obvious that the initial question was that which concerned the legislation upon the subject-matter and the legal effect to be given the requests and certificates herein.

It was observed that it was not proper to proceed to take evidence on disputed questions of fact until the legal questions arising on the face of the proceedings had been investigated and determined in such a manner as to show the necessity of resorting to an investigation of matters of fact in dispute.

The legislation upon which the respondents rely is the act of 1906. *P. L. 1906 p. 715; Comp. Stat. p. 3206 § 125 et seq.* The first section of this act provides:

"No person shall be committed to or confined in any institution for the care and treatment of the insane in this State except upon filing with

the Medical Director * * * an application in writing of a person interested in the admission of such person; said application shall state the following facts, if known to the applicant [description, age, &c. of patient] and the degree of relationship or other circumstances causing the applicant to interest himself in said person; and to every application filed as aforesaid shall be attached the certificates of two physicians under oath setting forth the insanity of said person."

"SEC. 2. No person so confined as aforesaid shall be held in confinement for more than fifteen days, unless the person applying as aforesaid shall within that time present, or cause to be presented, to the Justice of the Supreme Court presiding in the Courts of the County in which the person so confined resides [or to other named judicial officers], the application filed as aforesaid with the certificates attached as aforesaid, or copies thereof * * * said justice or judge may, in his discretion, on presentation to him of said application and certificates * * * institute an inquiry and take proofs as to the insanity of said person so confined; and said Justice or Judge may, in his discretion, call a Jury to determine the question of the insanity of said person * * *."

This section then provides that the inquiry must be finished in fifteen days, or if more time is required, the judge must so certify.

Subsequent sections provide for certificate by the judge and orders by him showing a finding of sanity or insanity and committing, releasing, transferring or otherwise dealing with the person and matter; and making all such judicial orders sufficient warrant for the head officer of the institution, doing whatever is therein contained.

There is provision made for indigent insane persons, although certain features of the previous act (*P. L. 1895 p. 497; Comp. Stat. p. 3204 §§ 117, 119*) are not incorporated in the later act or otherwise provided for.

The 1895 act provides for an application in the first instance to a judicial officer and the whole proceeding is under his control; and further requires the judicial officer to act when the application is made to him; and does not leave it discretionary whether to make the inquiry or not as the later act does. The earlier act also deals with those alleged to be insane and dangerous or violent.

Enough has been cited to indicate some of the obvious questions which at once occur to anyone considering the subject-matter.

The first impression one gets from reading this 1906 statute is

that it is intended as a regulation and protection of the public insane asylum, and was designed to prevent persons from obtaining lodgment therein unless certain formalities were complied with, such formalities as would result in restricting the patients to those who have been found to be insane. There is an entire absence of all provisions such as would be necessary if the act was one intended to be utilized to seize, detain and confine persons *in invitum*.

The very terms used in the first section of the act lend strength to this impression: "No person shall be committed or confined * * * except upon filing * * * an application in writing of a person interested in the admission * * *." And in the second section it is provided that the person confined is to be turned out in fifteen days unless the person making the application for the admission shall present the papers to a judge. All of this is understandable if the act is considered as above suggested it should be, as a regulation and protection of the public insane asylums and to prevent their being burdened with the care of those not found on inquisition to be insane, but they are not at all what we would expect to find in a statute intended to provide for the apprehension, arrest, detention and confinement of persons alleged to be insane. If the act was intended to protect the alleged insane and the public there would of necessity, it now seems to me, be provisions for warrants or orders of arrest or some substitute therefore, something in the nature of a commitment pending inquiry, a requirement that some court should exercise the jurisdiction, and there surely would not be a provision that the detained person (no matter how insane or dangerous to others or to himself, indigent, or what not) should be turned out at the end of fifteen days if the "interested person" does not choose to present the matter to the judge—or if the judge does not in his discretion choose to undertake an inquiry.

On behalf of the state it is argued, however, that this is not the construction which should be put upon the statute; that it is construed by the state officers as an act requiring the forcible caption and detention of any person on whose behalf anyone has interested himself to apply for admission to the insane asylum. They contend that if the application is regular in form and the

MAY TERM, 1912. 391

10 Buch. Allgor v. New Jersey State Hospital.

certificates of the physicians are attached as provided in the act, they are required to arrest and transport the person named in the application to the state insane asylum and there confine him against his will for fifteen days.

In passing, I think attention should be called to the fact that the certificates of the physicians, which are required by section 1 of the act to be under oath, do not contain matter which by section 5 would seem to be absolutely essential to their validity; and if this is found to be the case, the admission papers are not regular on their face. Section 5 of the act provides: "No certificate of insanity shall be made except after a personal examination of the person alleged to be insane made not more than six days prior to the confinement of said person * * *."

I fail to find in the certificates attached to the applications in the case at bar any time stated when any examination was made. This is surely an important, if not fatal, omission. The oath, as before stated in this case, is simply on information and belief. I will return now to the consideration of the statute in question as contended for by the state.

Only the briefest reference is necessary for certain fundamental considerations. I take it that in all legal proceedings persons are considered sane until or unless the contrary is shown. The fourteenth amendment provides: "That no state shall pass any law which shall deprive any person of life, liberty or property without due process of law." No act of a law-making body of a state can be good as a law if it deprives a person of liberty without due process of law.

1 do not propose in this off-hand memorandum to elaborate or to attempt to cite authorities.

I take it as too obvious to require argument that the phrase "due process of law" connotes something in the form of a legal proceeding, i. e., a tribunal, notice, opportunity to be heard, &c.

I therefore assume that no legislative act is law under the fourteenth amendment which seeks to deprive a person of his liberty excepting in the course of something in the form of a legal proceeding.

The briefest inspection of the act under consideration will show that by the construction put upon it by the attorney-general it

seeks to deprive persons of their liberty and to confine them against their will without the slightest pretence that it is in the course of any legal proceeding.

The attorney-general argues that the act permits anyone to interest himself in another person and thereupon to apply for the admission of such other person to the state insane asylum, and upon obtaining certificates of two physicians, it becomes the duty of the authorities at the asylum to take said person, confine and keep him against his desire to be free for a period of fifteen days; and longer if the "interested person," *i. e.*, the applicant, shall care to present the matter to a judge and the latter shall care to institute an inquiry and shall certify the further time over the fifteen days required for such purpose. If the "interested person" does not care to pursue the matter and does not therefore present it to a judge, then the asylum at the end of fifteen days' confinement releases the prisoner; similarly, I suppose, a release would result if the "interested person" should present the matter to a judge and he should exercise the discretion lodged in him by the act and determine *not* to make any inquiry.

Apparently, however, from the proceedings in the case at bar, the confinement may be indefinite if enough "interested persons" should file successive applications for the admission of the same person. In the case in hand, one such application was filed by Abrams, a marshal of a borough, upon affidavits taken before P. Hall Packer as notary public. The application was dated the 22d of July, 1912, and later, on August 2d, 1912, Packer, himself as the "interested person," filed an application for the admission of the same person.

In the return it is set up that he is detained in virtue of these two applications. The fifteen days under the first expired August 6th, and under the second, August 17th. It will readily be seen that if these applications are sufficient warrant to deprive a man of his liberty until fifteen days have elapsed to see whether the "interested person" who made the application will present it to a judge, then by such interested person in each instance refraining from so presenting the matter to a judge, the incarcerated person remains in confinement without possibility of release for as many fifteen-day periods as successive applications

shall warrant; and all without any provision for the alleged insane person to initiate any proceeding for trial.

Furthermore, it will not fail to be observed that there is no requirement upon anybody's part to present the matter to any judge or court. There is no opportunity whatever afforded the so-called insane person or anyone on his behalf; but the "interested person" or applicant for the admission has the choice of presenting the same to a judge or refraining as he sees fit. In my view it would be a sheer waste of time to discuss the question as to whether this could by any stretch of language or thought be considered "due process of law." There is no process of law about it. Thus construed the statute becomes an undue method of depriving persons of their liberty without anything resembling a legal proceeding being invoked. I cannot conceive it possible that such an act (so construed) would be a valid law under the fourteenth amendment to the constitution of the United States.

In the argument on behalf of the state, it was suggested that the detention of a person before trial or before inquest as to sanity and in similar situations has been held to be due process of law, and an attempt was made to assimilate the proceedings provided for by the act in question and such proceedings. I concede fully all the principles of law contended for by the learned counsel for the state, but am utterly unable to see their application to the facts of the case in hand. The very moment that you state that the detention is by virtue of an order in a proceeding before some legal tribunal you have differentiated your instance from the one at bar.

There has been much controversy even where the proceedings are legal in form, *i. e.,* where they are instituted in some tribunal charged with jurisdiction; controversy about detention without hearing, without sufficient cause, on insufficient allegations, charges, complaints, &c., through a whole variety of objections. But in every such case to which my attention was ever drawn it was laid down as a fundamental rule that before detention could be legal there must be some process of law occasioning it, that it was in the course of some proceeding legal in its nature or form.

In the suit at bar, as before stated, and as the return shows,

there is not the slightest pretence that the detention is justified because in the course of any proceeding legal in its nature or form. He is detained for fifteen days because an application has been made to admit him to the asylum and two physicians have made certificates and attached them to the application. No papers have been filed in any court. No application has been made to any court. No one is under any obligation to apply to any court and no opportunity is furnished the person in confinement to apply if he wanted to. In other words, no legal proceeding of any kind has been instituted and none need ever be so far as this act is concerned.

I cannot bring myself to believe that forcible detention under such circumstances is justifiable in view of the law.

This disposes of the matter actually before me; and I shall not attempt a review of the law otherwise relating to the whole subject-matter. Undoubtedly, the police power of the state is exercisable with respect to the insane when they are dangerous to self and to others and when they are proper subjects to be taken forcibly from their families and confined for the public good. There are statutes with respect to some such cases, and the common law covered others. A dangerous lunatic, as I understand the common law, was always subject to arrest and detention; due process of law would of course require the institution of some proceeding and proper orders for his final commitment therein. But with all such matters I have no concern on this writ and return.

The respondents set forth that they rely wholly upon the two applications for admission and upon the statute of 1906 as their warrant for his detention. I do not think such applications for admission are sufficient in view of the law, and I do not find that there is justification for holding him by reason of such applications.

Whether the other features of the act are sufficient to warrant his commitment pending an inquest and an inquiry and a finding therein, can undoubtedly be tested in the proceeding which has been instituted (since the granting of this writ) before a justice of the supreme court. One or both of the applications for admission have been by someone brought to the attention of said

justice and an order has been made by him which has been shown to me committing Allgor to the state asylum until an inquest shall be held. The order herein will of course not affect any order or proceeding by said justice. The order to be made herein will prohibit the further detention by virtue of anything in the return alleged. At the time of the return the only justification for holding the man was because of the applications for admission. These I find to be insufficient in law for the purpose of detention.

If the defendants justify themselves in holding him by virtue of some subsequent order of a justice of the supreme court, any attack thereon should be made to the justice who made the order. That matter arose subsequent to the writ and return and is not before me for adjudication. On behalf of the petitioners I am asked to proceed with an inquiry as to sanity or insanity of Allgor because of section 31a of the *Habeas Corpus* act. I decline to do so. In the first place, I find that he should be released so far as anything set up by the return shows, and therefore I certainly should not proceed with a perfectly useless inquiry. And secondly, I read that section as only applying to cases where there has been a commitment founded or purporting to be founded upon a finding of insanity; and a method of subsequent inquiry into this with a view of release if the person is found sane.

An order will be made in accordance with the views above expressed.